ANDREW J. FORGEY et al., v. MARY V. GILBIRDS, Appellant.

Division Two, November 24, 1914.

1. **CONTRACTS: Cancellation: Specific Performance: Fraud: Mutuality.** A widow and two children, Sarah and Noel, survived John F. Gilbirds, who died intestate seized of the legal title to 840 acres of land heavily encumbered. Sarah sued to enforce an alleged oral agreement to partition, and appealed to the Supreme Court from a decree vesting the title to all the land in the widow, her mother. The widow thereafter executed a deed to a trustee, which empowered him to manage the property, or if need be sell any part of it, for the purpose of paying off the incumbrances, together with debts of the grantor amounting to over $1800, the remainder to go to her for life and then in fee to her son and his wife. At about the same time she contracted to sell a portion of the land, and when she found she could not perfect title on account of Sarah's pending appeal in the partition suit, she entered into a contract with Sarah and her husband, dated April 28, 1909, by which it was agreed that the trustee should convey to the widow for life, with remainder in Sarah; that Sarah

Forgey v. Gilbirds.

should dismiss her appeal in the partition suit; that the proceeds of a sale of 334 acres, for which all parties agreed to make deeds, should go to pay the widow's debts and reduce the incumbrances; that the widow should, for her life, lease the remainder to Sarah and her husband for $300 a year, the lessees to pay all taxes and insurance; and that the lessees should have the right to sell, "as soon as practicable and on the best terms obtainable," all or any portion of the premises to further reduce the incumbrances, the widow agreeing to join in all deeds necessary to carry out any such contract of sale. Sarah's appeal was dismissed and the provisions of the contract were carried out, until Sarah's husband, in July, 1910, made a contract, which Sarah afterwards ratified, for the sale of sixty-four acres of the remaining land, whereupon the widow refused to join in a deed. To a suit for specific performance brought by Sarah, her husband and the contracting purchaser, the widow answered asking that the contract of April, 1909, be cancelled as unconscionable, not supported by valid consideration, and procured by false representations. She testified that, to induce her to sign, her daughter told her the $300 a year rent was a mere form—that she should never want. The evidence shows that the income from the premises was only about $865 a year, which left very little in the hands of Sarah and her husband after they made the payments specified in the contract of 1909.

*Held*, that, in view of all the facts, the trial court's refusal to cancel the contract of 1909 must be upheld, especially since there is no showing in the record that Sarah's appeal in the partition suit was other than meritorious, or that she refused or failed to carry out her promise to provide additional support for her mother.

*Held*, also that, since the contract of 1910, which must be considered together with that of 1909, definitely fixed the price and described the land; was mutual as regards the widow and the purchaser; was a sale "as soon as practicable and on the best terms obtainable," and was ratified by Sarah, the trial court was right in decreeing that the widow should perform specifically by joining in a deed to the purchaser.

2. **SPECIFIC PERFORMANCE: Undisclosed Principal.** Specific performance may be enforced either by or against an undisclosed principal when his duly authorized agent, in his own name, within the scope of the agency, has contracted concerning the sale or purchase of the principal's land.

Appeal from Pike Circuit Court.—*Hon. B. H. Dyer, Judge.*

AFFIRMED.

*Pearson & Pearson* for appellant.

(1) The court erred in entering a decree against appellant: First: Because she was not a party to the contract with George W. Jacobs. Persons not parties to a contract cannot be required to specifically perform the same. Otto v. Young, 227 Mo. 215; Luther v. Stillwell, 73 Mo. 499; Pomeroy, Spec. Perf. Contracts (2 Ed.), p. 210, sec. 147; Fry's Spec. Perf. (5 Ed.), pp. 80, 94 and 171, secs. 205, 167 and 347; 36 Cyc. 595, sec. 6; Waterman on Spec. Perf. (1881 Ed.), pp. 80 and 120, secs. 58 and 92. Second: Because there is no mutuality of either right or remedy as to appellant. Neither appellant nor her interest in the property are mentioned or made known to George W. Jacobs, contracted with or for, by him in this contract. She is in no way privy to this contract—an absolute stranger. Equity will not specifically enforce a contract and sale of land, unless there be mutuality both as to obligation and remedy. Glass v. Row, 103 Mo. 539; Mastin v. Halley, 61 Mo. 200; Paris v. Halley, 61 Mo. 458; Huff v. Shepard, 58 Mo. 247; Holman v. Conlin, 143 Mo. 378; Davis v. Petty, 147 Mo. 383; Tenny v. Turner, 111 Mo. App. 600. Third: Because no consideration has passed, or been proffered to appellant, by respondent Jacobs for the execution and delivery of a deed to the land in question. Davis v. Petty, 147 Mo. 383; Lipscom v. Adams, 193 Mo. 546; Rosewald v. Middlebrook, 188 Mo. 89. Fourth: Because respondent Jacobs has never purchased nor contracted to purchase from appellant any land, nor the interest in any land owned by appellant. This contract is in the face of the Statute of Frauds, requiring contracts for the sale of real estate to be in writing, and signed by the party to be charged. Sec. 2783, R. S. 1909. (2) Respondents have no standing in a court of equity, seeking to

enforce the specific performance on the part of appellant, of a clause in the contract of 1909, favorable and beneficial to them, when they have not performed the whole of that which they contracted to do. Rosenberger v. Jones, 118 Mo. 567; Mastin v. Halley, 61 Mo. 202; Improvement Co. v. Tower, 158 Mo. 292; Secret Service Co. v. Gill-Alexander Mfg. Co., 125 Mo. 156; Clay v. Mayer, 183 Mo. 159. Respondents did not wash their hands before they entered the Supreme Court. They agreed to pay off the remaining incumbrance, in consideration of appellant having deeded to them the remainder interest in all of her property. Appellant caused such a deed to be made. Respondent Sarah J. Forgey now has title to such remainder interest and appellant gets nothing for that interest. Removal of the incumbrances was the consideration to be paid on respondents' part for this remainder interest. The contract of 1909 is not definite and certain. There was no mutuality. Even if enforcible, respondents have not complied with the terms and conditions of this clause of the contract. (3) Appellant would further insist, that she should not be forced to perform this contract made by Forgey with Jacobs, because, it would thereby force the performance of the contract of April 28, 1909. Which contract, as its terms and the evidence in this case show, is: First: A biting, unconscionable contract, supported by a boggy and inadequate consideration; second: Procured by deception and false and fraudulent representations; third: Forced, by the stress of financial embarrassment, after the appellant had been led to believe that respondents were ready and willing to assist her by making an entirely different contract; fourth: That respondents have failed to show a performance on their part of each essential ingredient of the contract, which, by the terms of the contract is to be performed by them; fifth: That by the allegations in the petition, respondents affirmatively show, that they have not complied with the

terms of the contract as a condition precedent to their rights to have appellant perform the same on her part; and, that such a decree, would produce injustice; and, would be inequitable, considering all the circumstances of this case. Gottfried v. Bray, 208 Mo. 658; Clay v. Myer, 183 Mo. 158; Holman v. Conlin, 143 Mo. 378; McIlroy v. Maxwell, 101 Mo. 305; McQuay v. Land Co., 230 Mo. 361; Real Estate Co. v. Spellbrink, 211 Mo. 710; Pomeroy v. Fullerton, 131 Mo. 710; Kirk v. Middlebrook, 201 Mo. 288; Rosenwald v. Middlebrook, 188 Mo. 88; Lampton v. Chensy, 186 Mo. 551; Gloeckner v. Kittlaus, 192 Mo. 495.

*Frank J. Duvall* and *Hostetter & Haley* for respondent.

(1) In equity suits appellate courts defer largely to the finding of the trial courts on account of the superior vantage ground of the trial judge in observing the demeanor of the witnesses. (2) A party cannot be permitted to avoid the effect of a contract by an assertion that the other party to the contract agreed that its terms should not be binding; nor will the party be permitted to deny that it expresses the agreement which he made; nor can a contract be avoided by one of the parties thereto on the ground that he did not read it (he being *sui juris*), or that if he read it he did not understand its terms. Jones v. Shaw, 67 Mo. 667; Smith v. Thomas, 29 Mo. 307; Bank v. Fesler, 89 Mo. App. 226; Wislizenus v. O'Fallon, 91 Mo. 184; Crim v. Crim, 162 Mo. 544, 54 L. R. A. 502; Mfg. Co. v. Carle, 116 Mo. 591; England v. Houser, 163 S. W. 890; Avery Co. v. Powell, 161 S. W. 335; Beck v. Obert, 54 Mo. App. 240; Ely v. Sutton, 162 S. W. 755; Bank v. Bank, 244 Mo. 594; Berheret v. Myers, 240 Mo. 75. (3) Courts of equity will enforce contracts which are fair and reasonable and will decree specific performance of the same, not as a matter of grace, but as a matter

of right. Evans v. Evans, 196 Mo. 1;. Kilpatrick v. Wiley, 197 Mo. 123; Pomeroy's Equity Jurisprudence (3 Ed.), sec. 1404; Hardy v. Matthews, 42 Mo. 406; McQuitty v. Wilhite, 247 Mo. 163. It is frequently said (somewhat loosely, we think) that courts grant specific performance of contracts in the exercise of a discretion, thus leaving the inference at least, that it is entirely discretionary with the court whether it will grant the specific performance or not. This is not the correct interpretation to put on such expressions. The discretion mentioned is not an arbitrary, or capricious one, but is a sound judicial discretion, and controlled by established principles of equity as applied to the facts of the case. Land & Lumber Co. v. Blackman, 202 Mo. 307; Kirkpatrick v. Pease, 202 Mo. 493; Berberet v. Myers, 240 Mo. 58; Hunting & Fishing Club v. Hackman, 156 S. W. (Mo. App.) 791. As to the question of mutuality: An undisclosed principal may sue on and enforce a contract made for the sale of realty by his agent in his (the agent's) own name. Davidson v. Hurty, 133 N. W. 862, 39 L. R. A. (N. S.) 324; Schmucker v. Grain Co., 28 Okla. 721. Likewise an agent may contract for the purchase of land for an undisclosed principal and the latter may maintain a suit in his own name and enforce the contract, it being immaterial whether the principal was known or unknown during the transaction, or whether the party supposed he was dealing with the agent personally, and on his own behalf. Kelly v. Thuey, 143 Mo. 438; Pomeroy, Specific Performance (2 Ed.), sec. 89; Fry, Specific Performance (3 Ed.), sec. 238; Otto v. Young, 227 Mo. 193; Randolph v. Wheeler, 182 Mo. 145. A contract for the sale of land may be specifically enforced although it is not signed by both the parties thereto. Mastin v. Grimes, 88 Mo. 478. The remedy of specific performance is based upon the existence of a contract between the parties to the suit or between

those through whom they claim. 26 Am. & Eng. Ency. Law (2 Ed.), p. 20. The principle that contracts must be mutual and binding upon both parties does not, it has been held, mean in every case that each party must have the same remedy for a breach by the other, but only that the contract is enforcible on both sides in some manner, not necessarily by specific performance in each instance. 26 Am. & Eng. Ency. Law (2 Ed.), p. 32. (4) Unconscientious conduct and acts by a plaintiff in order to prevent specific performance must be confined to misconduct in regard to or at all events connected with the matter in litigation. Pomeroy's Equity Jurisprudence (3 Ed.), sec. 399. (5) The construction which the parties have placed upon a contract themselves is strongly persuasive with a court in interpreting its meaning. The defendant in a suit for specific performance who had theretofore acted on the contract as it was understood by the plaintiff is bound thereby, and cannot set up the defense that the contract was to be construed differently, and that the plaintiff had refused to carry it out according to such different construction. 26 Am. & Eng. Ency. Law (2 Ed.), p. 42. Mrs. Gilbirds in her arrangement with Dr. Morrow conceded by the express terms of the deed that it was absolutely necessary that the land should be sold so as to provide the money with which to pay off the encumbrances; and in the contract with Mr. and Mrs. Forgey of April 28, 1909, in addition to it being expressly provided that they should sell the land and use the money derived therefrom in discharging the remaining encumbrances, to-wit, the $5800, Mrs. Gilbirds herself acted upon the theory that it was the meaning of that contract that Mr. and Mrs. Forgey should sell sufficient land to pay off the remaining encumbrances, but her chief objection was to them selling the home tract. She will not now be permitted under the authorities to claim a different interpretation of the contract from

that which she voluntarily placed upon it at and subsequent to the time it was drawn.

WILLIAMS, C.—This is a suit for specific performance of a contract whereby plaintiffs seek to compel defendant to join with the plaintiffs Sarah J. and Andrew J. Forgey in conveying to plaintiff Jacobs the title to 65 acres of land located in Pike county, Missouri. Defendant filed a general denial and in her answer, seeking affirmative relief, asked to have the written contract cancelled, on the grounds of fraud and misrepresentation in its procurement. Trial was had in the circuit court of Pike county, resulting in a decree in favor of plaintiffs and denying defendant the affirmative relief sought, and directing that the money derived from the sale be used in paying off the encumbrance. Defendant thereupon perfected an appeal. In 1904, appellant's husband, John F. Gilbirds, died intestate, vested with the legal title to a tract of 840 acres of land situated near Bowling Green, Pike county, Missouri. The 65 acres involved in this suit, and known as the Home Farm, was a portion of said tract of land. Said Gilbirds left surviving him his widow, Mary V. Gilbirds (appellant herein), and two children, Sarah J. Forgey (respondent herein), and Noel F. Gilbirds. Sarah married Andrew J. Forgey (respondent herein) a short time before her father's death. A few months before his death, said Gilbirds, his wife joining him therein, executed two separate deeds of trust. One deed of trust to secure the sum of $18,000, covering all of said land except 120 acres; the other deed of trust for $800, covering the remaining 120 acres. Some time after the death of said Gilbirds, the widow and the heirs joined in making a sale and conveyance of about 140 acres of this land to a Mr. Quinn for $3600, which money was applied on the mortgage indebtedness. Later a controversy arose between the widow and her children with reference to the division of the land and,

as a result thereof, Sarah J. Forgey, joined by her husband, brought a partition suit to enforce an alleged parol partition agreement. It appears that as a defense to said suit the widow set up the claim that she had furnished the entire purchase price for said 840 acres of land at the time that it was purchased and the title taken in her husband's name. A trial of this suit was had resulting in a decree in favor of the widow (appellant herein), and by said decree the legal title was divested out of the heirs of her said husband and vested in her. Mrs. Forgey thereupon perfected an appeal in said cause to this court.

A few months thereafter, Mrs. Gilbirds, being joined by her son Noel and his wife, executed a deed conveying all of their interest in and to the remaining 700 acres of this land to one Winn F. Morrow, of Kansas City, Missouri, in trust. Mr. Morrow was the father-in-law of Noel F. Gilbirds. This deed recited that all of the land conveyed belonged to Mary V. Gilbirds except 160 acres thereof which belonged to Noel F. Gilbirds and his wife. The deed recited that the property was encumbered by the $18,000 mortgage; that there was then interest due to the amount of $720, and that Mrs. Gilbirds was indebted to a law firm in the sum of $800 for legal services, and also indebted to Maud M. Gilbirds in the sum of from $300 to $500. Said deed further stated that it was the desire of the first parties thereto to have all of said property managed by said Morrow and to subject portions of said land to sale for the purpose of discharging the debts in said deed mentioned and to provide for the final distribution and descent of said property. The trustee was empowered to take possession of, manage and control the property and to make sale of any portion or portions of the property, as he might see fit, for the purpose of raising funds with which to discharge the above-mentioned debts. The instrument further provided that after said indebtedness was paid off in the above man-

ner, the title of said real estate should revert as follows: The remaining portion of the land belonging to Noel and his wife should revert to them and be held by them as it was before the trust conveyance was made. The remainder of the property was to go to Mary V. Gilbirds for life with remainder over to Noel F. Gilbirds and his wife as tenants in common. At about this time, whether before or after the trust deed was executed to Morrow, it does not clearly appear, Mrs. Gilbirds had contracted to sell about 134 acres of this land to George W. Chapple for approximately $7000 and she also desired to make sale of about 160 acres of the land to her son Noel for the price of about $4400, which price was about $5000 less than its market value. After the property was conveyed to Mr. Morrow, Mrs. Gilbirds became dissatisfied with the arrangement provided in the trust deed; and was also unable to perfect title to the 134 acres contracted to be sold to Mr. Chapple and to the 160 acres to her son Noel, without Mrs. Forgey and her husband joining in making the conveyances. This, apparently, due to the fact that the appeal in the partition suit was pending in the Supreme Court and the purchasers were unwilling to pay the purchase price unless the Forgeys joined in the conveyance. In this situation, Mrs. Gilbirds employed an attorney for the purpose of aiding her in getting the title back from Mr. Morrow and to make general adjustment of the situation, whereby sales could be made of sufficient property to pay the indebtedness and title thereto delivered to the purchasers. The attorney made a trip to Kansas City and then took the matter up with the attorney for the Forgeys with a view to making an entire adjustment of the situation. These negotiations continued for several weeks, finally resulting in the trustee, Mr. Morrow, making conveyance of all of said land, except the 160 acres owned by Noel and his wife, to Mary V. Gilbirds (appellant herein) and Sarah J. Forgey (respondent here-

in). The deed provided that Mrs. Gilbirds should have a life estate in said real estate only and that the remainder in said property was vested in Sarah J. Forgey. As a part of the settlement, it was further agreed that the Forgeys would dismiss their appeal in the partition suit then pending in the Supreme Court. On the same day that this deed was executed, and as a part of the general adjustment of the situation, the following contract, dated April 28, 1909, was entered into by and between Mary V. Gilbirds as first party and Sarah J. Forgey and Andrew J. Forgey as second parties:

This contract made and entered into this 28th day of April, 1909, by and between Mary V. Gilbirds, party of the first part, and Sarah J. Forgey and Andrew J. Forgey, parties of the second part, and all being of Pike county, Missouri,

Witnesseth: Whereas, the real estate described in a certain deed made by Mary V. Gilbirds, Noel F. Gilbirds and Maude M. Gilbirds to Winn F. Morrow dated July 3, 1909, and recorded in book 142 at page 561 of the deed records of Pike county, Missouri, is encumbered by a certain deed of trust originally given to the Prudential Insurance Company of America, which deed of trust is recorded in Vol. 128 at page 118 of the deed records of Pike county, Missouri, and upon which deed of trust there now remains due and unpaid approximately a little over fifteen thousand dollars, and whereas there is another encumbrance of eight hundred dollars on a portion of said real estate which was given originally to the People's Savings Bank of Bowling Green, Missouri, and whereas it is the intention of the parties to this instrument that the title to said lands shall be transferred from the said Winn F. Morrow back to said Mary V. Gilbirds during her life with remainder to her daughter, Sarah J. Forgey, and it is further the intention of the parties to this instrument that the encumbrance above mentioned, together with certain other debts which the said Mary V. Gilbirds is liable for, which debts are mentioned in said deed from Mary V. Gilbirds et al. to Winn F. Morrow, shall be paid off or reduced as far as possible in the following manner, by applying the proceeds of the sale of about 184 acres of said lands to George W. Chapple on said indebtedness and also by applying the proceeds of the sale of 160 acres of said land to Noel F. and Maude M. Gilbirds on said indebtedness, it being the intention of the parties to this instrument to make suitable deeds to consummate the transfer of the title to said parties.

The said parties of the second part in consideration of the premises hereinafter mentioned agree and obligate themselves to

pay off and discharge the remaining encumbrance against said land remaining after such transfers so mentioned shall have been made, under the conditions as hereinafter stated, so that in the end whatever lands there may remain shall be free and clear of any encumbrance now existing and to that end it is agreed by and between the parties hereto as follows: That the real estate mentioned in said deed to said Winn F. Morrow except those portions to be conveyed to George W. Chapple and to Noel F. and Maude M. Gilbirds shall be conveyed to Mary V. Gilbirds for and during her natural life, the remainder, after her life estate to be vested in Sarah J. Forgey with this proviso, however, that in the event Sarah J. Forgey shall die before the said Mary V. Gilbirds, then such remainder shall revert back to said Mary V. Gilbirds and vest in her.

It is further agreed by the parties to this instrument that the the said Mary V. Gilbirds leases to the said parties of the second part all of said real estate the title to which remains in her for and during her natural life, at a fixed annual rental of three hundred dollars ($300) payable quarterly, the first installment of seventy-five dollars being due and payable immediately, and the second payment of seventy-five dollars to be due and payable on June 1, 1909, and the remaining installments of $75 at the end of each succeeding three months thereafter during the lifetime of the said Mary V. Gilbirds or until the termination of this lease by the death of Sarah J. Forgey before the death of said Mary V. Gilbirds, which contingency is the only event the happening of which will terminate this lease unless the same shall be terminated by the voluntary consent and agreement of all the parties to this instrument.

It is further understood and agreed that in addition to the payment of the $300 per annum rent the parties of the second part will pay and discharge all taxes against said land which may hereafter become due and payable during the existence of this lease.

It is further understood and agreed that the parties of the second part will pay all necessary insurance premiums on the buildings on said premises and will look after keeping said premises in repair.

It is further understood and agreed that the party of the first part will give possession of said premises within a reasonable time and that said parties of the second part shall have the exclusive right to manage, control and lease said premises and collect all rents arising therefrom and receive the benefit of all the products of said premises during the continuance of this lease.

It is further understood and agreed that the parties of the second part shall have the right to sell all or any portion of said premises either for the purpose of applying the proceeds of such sale or sales to the discharge of the remaining encumbrances against said premises or for the purpose of reinvesting, and the said party of the first part agrees to join in all necessary deeds to carry out such contract of sales as may be negotiated by said parties of the

second part, it being the desire and intention of all of the parties to this instrument that so much of the real estate which shall be conveyed back to Mary V. Gilbirds by the said Morrow shall be sold as soon as practicable and on the best terms obtainable in order that the encumbrance which remains against said lands shall be paid off and discharged to the end that whatever remains of said lands, the title to which shall be in said Mary V. Gilbirds and Sarah J. Forgey, as above stated, may be free and clear of encumbrance.

It is further understood and agreed that whatever sales of any portion of said premises may be consummated by said parties of the second part the proceeds of the same shall be devoted and applied to the payment and extinguishment of the encumbrances now existing on said premises until the same shall be fully discharged, and it is further agreed that this lease shall continue and remain in force during the natural life of said Mary V. Gilbirds unless sooner terminated by the mutual consent and agreement of all parties hereto or by the death of said Sarah J. Forgey happening before the death of said Mary V. Gilbirds.

It is further understood and agreed that all existing contracts for the leasing of all or any portion of said premises shall enure to the benefit of the said parties of the second part and they shall have the right to collect from said tenants who may be holding by existing leases whatever rents may be due from them for the use of said premises.

In witness whereof the parties have .hereunto set their hands to this and a duplicate contract on the day and date above written.
(Signed)                    MARY V. GILBIRDS,
                            SARAH J. FORGEY,
                            A. J. FORGEY.

At the time this contract was made Mrs. Gilbirds was 67 years old, Mrs. Forgey 31 years old and Mr. Forgey 61 years of age.

In order to assist in consummating the settlement, Mr. Forgey advanced to Mrs. Gilbirds' attorney the sum of $1250, the greater portion of which was used in paying off obligations of Mrs. Gilbirds which were mentioned in the trust deed to Mr. Morrow. After the foregoing contract was executed all the necessary parties joined in making conveyances of the land to Mr. Chapple and to Noel F. Gilbirds to the 160 acres and the proceeds of these two sales were applied on the mortgage indebtedness, reducing the same to approximately $5000, and arrangements were made by which a

local bank of Bowling Green became the purchaser of the balance of said mortgage indebtedness. Mr. Forgey took charge of the land, improved some of the fences, placed a tenant on the home tract and rented a greater portion of the farm to tenants and exercised general supervision over the farm; collected rents; paid the accrued interest on the loan, the insurance on the buildings and the taxes on the land during the years 1909 and 1910. In July, 1910, said Andrew J. Forgey entered into a contract with George W. Jacobs (one of respondents herein), whereby said Forgey agreed to sell and convey to said Jacobs for the sum of $7500 the 65 acres now involved in this law suit. Mrs. Forgey did not join with her husband in making the contract of sale with Jacobs but later executed a separate, written ratification of said contract, directing that said written ratification be attached to the original contract between Mr. Forgey and Mr. Jacobs. Mr. Forgey had been attempting to make a sale of the home tract for some time and had received an offer of $100 per acre for the same from another party and finally made the foregoing agreement whereby the purchase price was fixed at $115 per acre. When the time came for consummating the deal and making the conveyance of the property to said Jacobs, Mrs. Gilbirds refused to sign the deed and thereafter this suit was instituted. The evidence shows that Mr. Forgey collected as rents from the tenants on the farm in cash rents and grain rents an average of about $865 for each of the years of 1909 and 1910. That he paid Mrs. Gilbirds each year the sum of $300, as provided in the contract, and six per cent interest on the $5800 encumbrance amounting to $348 per year. This would leave in his hands each year the sum of approximately $225, out of which he had to pay the taxes, insurance and repairs. The evidence does not show what these last items amounted to each year. The evidence on the part of the Forgeys tended to show that they had complied in full with their

part of the contract with Mrs. Gilbirds; and in addition. had offered to let her come to their home and live, which she did for a few weeks, and that they had purchased a home for her near their home in Paynesville, Missouri, and had asked her to send for her household goods, move into the house and occupy it as her home, but that she refused to move into the house. Mrs. Forgey testified that she had given her mother several dresses and considerable clothing, and that before the contract was signed she had told Mrs. Gilbirds's attorney that she would always take care of her mother and that she would not want for anything. The evidence on the part of Mrs. Gilbirds was to the effect that before she signed the contract she made objection to the amount of $300 being provided for her support, and made the statement that it was not enough for her to live on and that her daughter told her that the $300 was a mere matter of form and that she would see that she would never want for anything, and that after the contract was signed she was treated coolly when she went to live at her daughter's house; that she did not blame her daughter for this but blamed her daughter's husband. That Mr. and Mrs. Forgey owned a general store a Paynesville and that she purchased some small articles at different times and that each time Mr. Forgey paid her the quarterly rent of $75 he deducted therefrom the amount of her bill at the store. She denied that Mr. Forgey had purchased the home for her at Paynesville, but admitted that they had invited her to use it as her home. The evidence further showed that Mrs. Gilbirds, aside from her interest in the farm, owned an equity in a city lot in Bowling Green, Missouri, diamonds valued at $4000 and household furniture.

The following excerpts are fair samples of the testimony of Mrs. Gilbirds concerning the contract, etc.:

"Q. Did you or did you not believe the statements made to you by your daughter, that that $300 consid-

eration didn't amount to anything, and that she would see that you wanted for nothing? A. Yes, sir, I certainly did, or I never would have signed it in the world.

.    .    .    .    .    .    .    .    .

"Q. Coming back to the question: What did Mrs. Forgey say to you at my residence that Sunday afternoon, which you say deceived you? A. She didn't say so much at your residence, except to state that she wanted me to have my own spending money, that the $300 wasn't enough for me to live on, and that she would give me all I wanted, and she said, 'I will get your clothes and things, and they shan't cost you anything.'

.    .    .    .    .    .    -    .    .

"Q. All that Mrs. Forgey said, was that she wanted you to have your own spending money, and you know that I will take care of you? A. Yes, sir.

"Q. That's all she said? A. Yes, sir, I think that's all she said.

"Q. That, you think, was an inducement for you to sign the contract? A. She offered me more, she said, 'You come down and live at my home, and I will make you comfortable.'

"Q. Did that influence you to sign the contract? A. No, sir, because I knew if things didn't suit me there I wouldn't stay—

.    .    .    .    .    .    .    .    .

"Q. That was a bad contract, this contract of April 28, 1909, that was a cut-throat contract, I believe you stated? A. Yes, sir.

"Q. When did you make up your mind that it was? A. I made up my mind that it was before I signed it.

"Q. You admit, then, that you read the contract over three times before you signed it? A. I read the lower part where he was to get my crops and everything from the place.

"Q. You read that? A. Yes, sir.

. .  .  .  .  .  .  .  .  .

"Q. You still say it was a week or ten days before you actually signed it, and during that time you saw the contract, you called at Judge Gray's office and saw the contract, you say, three times, and read it; is that right? A. I guess so, if you say so.

"Q. I am not saying anything; I am asking you about it. A. I don't scarcely know. I looked at it at least three different times, in case that I wanted to read it, but I don't know that I read it that many times, and I thought she would be good and kind to me, and that her husband would treat me nice and kind, I thought she would do it again, and I signed the contract, and I found out that they didn't do as they had agreed and their treatment was cold—

. .  .  .  .  .  . .  .  .

"Q. Mrs. Gilbirds, Mrs. Forgey on the witness stand said that she had always given you whatever you needed; state to the court whether she has provided all you want or not. A. No, sir, and she knows it too well; she has given me some little things that wasn't charged to me, but I think nearly everything I got there was charged to me, and it was deducted from that $75 I was to get every quarter.

"Q. Was everything that you bought at the store charged against you? A. Very near all, except what she gave me.

"Q. What was the nature of the things that she gave you? A. She gave me one very fine lace waist that she made out of her old one, and that I appreciated very much, and she gave me some two or three little things.

"Q. I want you to tell the court just what she has given you as near as you can remember? A. She has given me some very nice things. I don't remember, not many, but we were always exchanging presents between us; she gave me a very nice coat in St. Louis, and I was very proud of it, and which I still have; and

she paid my hotel bill once or twice, and several little things.

"Q.   What has she done towards paying your house rent and your grocery bills and clothing here in Bowling Green? A.   She paid one month's rent, and she moved me off the farm.

"Q.   And that's all she paid? A.   Yes, sir."

Appellant's grounds for reversal when reduced to their last analysis are as follows:

1st.   The contract of April 28, 1909, should be cancelled because unconscionable, unsupported by an adequate consideration and was procured by false representations.

2nd.   If the contract is not to be cancelled yet it should not be enforced because:

a.   Of want of mutuality.

b.   It is too indefinite to be enforced by a court of equity.

c.   The Forgeys have failed to perform the same.

d.   The power of sale if valid could only be exercised by the joint action of Mr. and Mrs. Forgey whereas Mr. Forgey alone contracted for the sale to Jacobs.

These propositions will be discussed in their order.

I.   It is contended that the contract set forth in the foregoing statement should be cancelled because it is an unconscionable contract, unsupported by an adequate consideration and was procured by false representations.   In supporting this point, appellant contends that for the small outlay of $300 annually during the remainder of Mrs. Gilbirds life, the Forgeys obtained from Mrs. Gilbirds the rents and profits from this large tract of land during the lifetime of Mrs. Gilbirds and upon her death the remainder in fee to become vested in Mrs. Forgey.   A careful review of

*Cancellation of Contract Asked for Fraud, etc.*

the evidence, however, discloses that the above is not an accurate statement of the situation either with reference to what was surrendered by Mrs. Gilbirds or with reference to what was surrendered by the Forgeys as consideration for the agreement. The defect in the statement is that it assumes that prior to the agreement Mrs. Gilbirds was the owner of the fee simple title to said land and further assumes that the sole consideration coming from the Forgeys was the annual payment of $300.

The contract of April 28, 1909, between Mrs. Gilbirds and the Forgeys and the deed of even date from Morrow, as trustee, to Mrs. Gilbirds and Mrs. Forgey must be considered in the light that they were parts of one transaction, because they were both executed as the final adjustment of the unfortunate condition of affairs existing between all the parties owning, or claiming to own, an interest in the land (excepting, of course, the mortgagees); and in determining the question of adequacy of consideration the situation should first be viewed with reference to the conditions existing prior to said final adjustment. Turning to the evidence in this regard, we find that, at that time, Mrs. Gilbirds instead of owning the fee simple title to the land (as appellant would seem to assume), owned only an equitable life estate in that portion of the land remaining after sufficient of the land should be sold to satisfy the existing encumbrances; the legal title, together with the right to possession of the land and to collect the rents and profits, was in Mr. Morrow, as trustee, and the equitable fee simple estate in remainder was in Noel Gilbirds and wife as tenants in common. In addition to this an outstanding cloud upon the title existed by reason of an appeal having been taken by Mrs. Forgey from the decree in the partition suit, by which decree the title had been divested from the heirs of John Gilbirds (one of whom was Mrs. Forgey) and vested in Mrs. Gilbirds. In that situation,

conveyance of any of the property was deadlocked; interest was accumulating on the encumbrances; Mrs. Gilbirds was receiving no income whatever from the land, and foreclosures under the mortgages were imminent. By virtue of the general adjustment which culminated in the contract in question the Forgeys agreed to and did dismiss the appeal in the partition suit above referred to and agreed to join in the conveyances, thereby clearing the way to make title to the land, so that, for the purpose of satisfying the encumbrances, portions of the land could be sold at private sale and the hazard of sacrifice incident to sale under foreclosure be avoided; Mr. Forgey advanced the sum of $1250 with which to satisfy certain claims against Mrs. Gilbirds which were mentioned in the deed to Morrow, trustee; Mrs. Gilbirds retained her life estate the same as before and in addition thereto the contract provided that in the event Mrs. Gilbirds should survive Mrs. Forgey the remainder in fee should thereupon vest in her, otherwise to be in Mrs. Forgey. By said contract the Forgeys became the lessees of the land for the rental of $300 per year, the lease to terminate upon the death of Mrs. Forgey, if Mrs. Gilbirds was then living. The Forgeys further agreed to pay all taxes, insurance on buildings, and to keep the premises in repair. As will be noticed from the statement of facts set forth above, the average annual income remaining in the hands of the Forgeys after payment of the rental and interest was approximately the sum of $225, out of which they were obligated to pay the taxes and insurance, and to keep the premises in repair. What these additional items would total does not appear, but the amount remaining would certainly be very small. The contract further undertook to vest in Mr. and Mrs. Forgey the power which had just prior thereto been vested in Morrow, trustee, to-wit, the power to make contracts for the sale of sufficient of said lands to pay off the existing encumbrances.

Appellant contends, however, that the appeal taken from the decree in the partition suit was not taken in good faith but that said appeal was without merit and was taken for the purpose of harassing appellant and unfairly coercing her to sign the contract. If this were true, it would undoubtedly so color the transaction with fraud and unfair dealing as to cause a court of equity to give relief. But the contention must fail because it is not supported by the evidence. It is true, no doubt, that the right of appeal exercised by Mrs. Forgey did exert a strong influence in producing the contract in question. As much is conceded by respondents. But this does not prove that the appeal was without merit or that it was impelled by bad faith. This, because an appeal in good faith and upon meritorious grounds would also produce that result. The record in the present case is silent with reference to the merits or demerits of Mrs. Forgey's rights under the then pending litigation, and we are therefore unable to say that it was without merit and promoted in bad faith.

With reference to the claim of false representations, the testimony of both Mrs. Forgey and Mrs. Gilbirds was, in substance, that before the contract was signed Mrs. Gilbirds objected to the contract on the ground that the $300 provided for her was not sufficient to keep her and that Mrs. Forgey stated that the $300 was only a matter of form and that she would see that her mother was amply provided for. From aught that appears in the evidence, there is nothing to show but that this promise was made in good faith. The daughter admits that she made the promise and insists that she has carried out that promise and has helped her mother all that she would permit. Mrs. Gilbirds does not claim that her daughter has *refused* in any particular to live up to that promise but admits that her daughter has given her some outside aid. She further admits that the daughter asked her to make her home with the daughter and her husband at

Paynesville, which she did for several weeks, and that afterwards Mr. Forgey offered her the use of a residence property at Paynesville and offered to move her furniture there so that she might keep her own home, but this offer she refused. The main fault that Mrs. Gilbirds found with the Forgeys, with regard to the failure of her daughter to furnish her outside aid, appears to arise from the fact that some small articles which she purchased at Mr. Forgey's store were charged to her and that Mr. Forgery kept the amount of the bill out of her rent money. The evidence does not disclose what these items were. Neither does the evidence disclose that these were called to the attention of Mrs. Forgey and that she refused to pay them. It is true that there were differences arising between the parties after this contract was signed, but upon a careful review of the testimony, the impression prevails that these conflicts were the result of a personal dislike which Mrs. Gilbirds entertained for Mr. Forgey, rather than because of a failure upon the part of Mrs. Forgey to supply Mrs. Gilbirds with necessary additional support.

We have painstakingly read the entire evidence in this case and have carefully considered all suggestions of counsel in their briefs, and while the writer is free to admit that upon first impression we were inclined to look with suspicion upon the entire transaction, because of the peculiar relationship of the parties, yet upon the ascertainment of the true situation, as disclosed by the entire record before us, we have no hesitancy in saying that the action of the court was proper in refusing to decree a cancellation of the contract.

II. Was the decree of the court proper in directing specific performance? Upon due consideration, we have reached the conclusion that this question must be

answered in the affirmative. In insisting

**Specific
Performance:
Mutuality:
Definiteness.** that the court erred in this regard, appellant, in one portion of her brief, handles the question on the theory that the written contract of April 28th is the only written document upon which the prayer for specific performance is based, and in another portion of her brief considers the question from the viewpoint that the contract between the Forgeys and respondent Jacobs is the sole contract sought to be enforced. Neither hypothesis is correct. Both contracts are to be considered together in determining that question. Respondent's theory is that Mrs. Gilbirds, by her contract of April 28th, authorized and empowered the Forgeys to make a contract of sale of the land, for the purpose of reducing or satisfying the existing encumbrance, and that in exercising the power thus given they entered into the contract with Jacobs, which, when read in connection with the contract of April 28th, obligated Mrs. Gilbirds to join in the conveyance and obligated Jacobs to purchase the land. That portion of the contract of April 28th giving the Forgeys the power to make contracts for the sale of the land was as follows:

"It is further understood and agreed that the parties of the second part shall have the right to sell all or any portion of said premises either for the purpose of applying the proceeds of such sale or sales to the discharge of the remaining encumbrances against said premises or for the purposes of reinvesting, and the said party of the first part agrees to join in all necessary deeds to carry out such contract of sales as may be negotiated by said parties of the second part, it being the desire and intention of all of the parties to this instrument that so much of the real estate which shall be conveyed back to Mary V. Gilbirds by the said Morrow shall be sold as soon as practicable and on the best terms obtainable in order that the encumbrance which remains against said lands shall be paid off and dis-

charged to the end that whatever remains of said lands, the title to which shall be in said Mary V. Gilbirds and Sarah J. Forgey, as above stated, may be free and clear of encumbrance.''

The above clause undoubtedly constituted the Forgeys the agents of Mrs. Gilbirds to make contracts for the sale of the land with power to fix the price of the land. The only words that in any manner undertake to limit their power to fix the sale price are the words expressing that it was 'the desire and intention of the parties that the land should be sold ''as soon as practicable and on the best terms obtainable.'' The evidence shows that the price for which the Forgeys agreed to sell the land to Jacobs was the best offer they had, after having the property on the market for several weeks, and it would appear from the evidence that said price was fair and reasonable and was the best price obtainable under the circumstances. The Forgeys acting for themselves with reference to the interest which they personally had in the land and as the agents for Mrs. Gilbirds, with reference to her interest therein, entered into the written contract of sale with respondent Jacobs. The terms of the contract with Jacobs definitely fixed the price and correctly described the land to be sold. Under those circumstances, a contractual relation arose which would give respondents the right to insist that Mrs. Gilbirds perform her written agreement to join in the conveyance. The rule is well settled that specific performance may be enforced either by or against an undisclosed

**Undisclosed Principal.** principal when his duly authorized agent, in his own name, within the scope of his agency, contracts concerning the sale or purchase of the land. [Pomeroy on Contracts (2 Ed.), sec. 89, and notes; Kelly v. Thuey, 143 Mo. 422, l. c. 438; Randolph v. Wheeler, 182 Mo. 145, l. c. 154-155.]

In view of the above rule, the contention of appellant that Mrs. Gilbirds could not have enforced the

contract against respondents, and that the relief sought must fail for lack of mutuality in the contract, cannot therefore be allowed.

The error of appellant's contention that the contract is too indefinite, because it does not fix the price at which the land shall be sold, arises from the fact that she looks only at the clause of the contract of April 28th giving the agents the power to sell, instead of looking at the consummated act of her agents, the written contract with Jacobs, which does definitely fix the price and terms of sale.

It is further contended that the contract should not be enforced because the Forgeys have not performed their part of the contract of April 28th. In this regard appellant contends that by said contract the Forgeys obligated themselves to pay off the encumbrances out of their own means. This is based upon that clause of the contract which reads: "The said parties of the second part in consideration of the premises *hereinafter mentioned* agree to obligate themselves to pay off and discharge the remaining encumbrances against said land remaining after such transfers so mentioned shall have been made, *under the conditions as hereinafter stated,*" etc. The italicised portions of the above quotation clearly show that the obligation to pay was not from their individual resources, but on the other hand expressly refer to the terms of the contract "hereinafter mentioned" and under the "conditions hereinafter mentioned," and it would indeed be a forced construction to give to said clause any greater effect than that they were bound to see that the moneys derived from the sale of portions of the land should be applied upon the encumbrances, or, at most, perhaps to obligate the Forgeys to prevent foreclosure of the property until sufficient of the land could be sold to satisfy the mortgages.

It is further contended that the power of sale in the Forgeys, if valid and binding, could only be exer-

cised by both of them acting together and that where-as Mr. Forgey acting alone made the contract with Jacobs, Mrs. Gilbirds did not become bound thereby. In this contention, appellant overlooks the important fact of the written ratification of the contract by Mrs. Forgey before this suit was instituted. By her written ratification of the contract, it became the joint action of herself and husband and leaves the contention without sufficient ground upon which to stand.

The judgment is affirmed. *Roy, C.,* concurs.

PER CURIAM.—The foregoing opinion of WILLIAMS, C., is adopted as the opinion of the court. All the judges concur, except *Faris, J.,* not sitting.